**19MAG 8952**

Approved: _/s/ [signature]_
DAVID RAYMOND LEWIS and VLADISLAV VAINBERG
Assistant United States Attorneys

Before:   HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :   SEALED
                                      COMPLAINT
          - v. -                  :
                                      Violation of 18 U.S.C. §
BRANDON BECKER,                   :   1349

          Defendant.              :   COUNTY OF OFFENSE:
                                      NEW YORK
- - - - - - - - - - - - - - - - x

19 MJ 0400

SOUTHERN DISTRICT OF NEW YORK, ss.:

MELODY SHEN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

1. From at least in or about 2012 through at least in or about October 2014, in the Southern District of New York and elsewhere, BRANDON BECKER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and an object of the conspiracy that BRANDON BECKER, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit BECKER engaged in a scheme at a company ("Sales Agent-1") of which he was the chief

executive officer ("CEO"), to falsify merchant applications and create shell merchant accounts to obtain credit and debit card processing services for millions of dollars of transactions from a financial institution, which scheme involved the use of wires.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2000, and I am currently assigned to a squad responsible for investigating economic crimes.

2. I base this affidavit on my training and experience and participation in this investigation, as well as on my conversations with others, including other law enforcement agents, and my examination of various reports and records, including records of the Federal Trade Commission ("FTC"), and a declaration sworn by a then-employee of the Attorney General's Office of the State of Florida (the "Declaration") in a civil action previously brought by the FTC and the Office of the Attorney General of Florida against BRANDON BECKER, the defendant, and others (the "FTC Action").[1] Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview of the Scheme to Defraud

3. From in or about 2012 through at least in or about October 2014, BRANDON BECKER, the defendant, together with others

---

[1] The FTC Action was principally resolved as against BRANDON BECKER, the defendant, with the entry of a consent injunction order, signed by BECKER on or about July 8, 2016, prohibiting BECKER and others from engaging in Credit Card Laundering (as defined therein), Payment Processing, or acting as an ISO (independent sales organization) or sales agent for any merchant, as well as the imposition of a monetary judgment of $12.36 million jointly and severally against BECKER and other defendants, among other terms. See Stipulated Order for Permanent Injunction and Monetary Judgment in FTC v. E.M. Systems and Services, CardReady, Brandon Becker, et al., 15 Civ. 1417 (SDM) (Sept. 14, 2016, M.D. Fla). Based on my interview of a representative of the FTC, BECKER has not paid any portion of the judgment.

2

known and unknown, participated in a scheme to fraudulently obtain millions of dollars of credit/debit card processing from a financial institution ("Bank-1") and its payment processor ("Payment Processor-1") by submitting falsified merchant applications through various shell companies. The merchant applications falsified material information relevant to the decision of Bank-1 and Payment Processor-1 to issue processing services to those merchants. The merchant applications falsified the true owner of the underlying business, the nature of the business, and details about the business's physical site and employees, among other things. BECKER and his co-conspirators perpetrated the scheme through Sales Agent-1, a Los-Angeles-based company in which BECKER served as the CEO. In return for extraordinary fees, ranging up to a third of a merchant's transaction volume, Sales Agent-1 made it possible for high-risk merchants to conceal their identities, spread out fraudulent charges across multiple sham accounts, and gain and maintain access to the payment card processing system.

4. In one particular instance, the scheme enabled credit card processing for a Florida-based telemarketing scheme operated by a "Telemarketer-1," which marketed an "interest rate reduction" and "budget consolidation" program to thousands of vulnerable victims who were facing debt problems. That telemarketing scheme was thereby able to process over $19 million in transactions from its victims, of which over $6 million was ultimately repaid to consumers in refunds and chargebacks.[2]

The Payment Card Processing Industry

5. Based on my training and experience and participation in this investigation, I know that in order to accept payment cards (*i.e.*, credit and debit cards) in payment for goods and services, a business is required to complete a merchant application and establish a merchant account with a financial institution ("sponsoring bank") that is a member of the "Payment Card Network" (*i.e.*, Visa, MasterCard). Various entities act as intermediaries between merchants and sponsoring banks. These entities include companies like Sales Agent-1, generally referred to as a "sales agent" or sub-ISO (independent sales organization), which find merchants, agree to obtain processing services for the merchant, and submit merchant applications to a wholesale ISO to obtain

---

[2] A chargeback is a reversal of a purchase processed by the payment processor. It differs from a refund, which is processed by the merchant.

payment processing services from a payment processor and its sponsoring bank.

6. These relationships are regulated by contracts between the sales agent, the wholesale ISO, and the payment processor, which incorporate contractually agreed-upon guidelines from the Credit Card Networks, sponsoring bank, and its associated payment processor (collectively, and as relevant to Sales Agent-1, the "Guidelines"). During the relevant time period, the Guidelines and relevant contracts prohibited Sales Agent-1 from submitting for payment processing certain "unqualified" businesses, including those marketing debt consolidation, credit repair services, and interest rate reduction; the Guidelines also prohibited onboarding[3] merchants engaging in deceptive tactics to avoid chargeback monitoring programs, among others.

### The Scheme

7. At all times relevant to this Complaint, BRANDON BECKER, the defendant, functioned as the CEO and *de facto* head of Sales Agent-1.

8. From in or about 2010 through at least in or about 2015, Sales Agent-1 was a sales agent and sub-ISO that obtained payment processing services for merchants interested in accepting payment cards as payment for goods and services.

9. In or about the summer of 2012, BRANDON BECKER, the defendant, caused Sales Agent-1 to become involved in a deal (the "Telemarketing Scheme") to provide credit/debit card processing for a telemarketing company, Telemarketer-1. Based on my interviews with former employees of Sales Agent-1 and reviews of emails, including emails that referred to the deal as the "32% deal," I know that BECKER negotiated for Sales Agent-1 to retain nearly one-third of Telemarketer-1's credit card sale transactions in exchange for providing Telemarketer-1 access to the credit card processing network.

10. Based on my review of the Declaration, emails, and reports of interviews with and complaints from Telemarketer-1's customers, I know that Telemarketer-1 was engaged in a telemarketing scheme, in which it placed cold-calls to consumers

---

[3] "Onboarding" refers to approving a particular merchant for processing and entering the information pertaining to that merchant into a data system shared by an ISO and an affiliated payment processor, and thus enabling payment processing for that merchant.

4

and sold them purported financial services at costs ranging from approximately $695 to at least $1295. The services offered by Telemarketer-1 included debt-consolidation and interest-rate reduction, which was prohibited by the Guidelines, and which, as BECKER and his co-conspirators well knew, would produce chargebacks from dissatisfied customers far in excess of the number and rate of chargebacks permitted under the Guidelines.

11. In securing credit/debit card processing for Telemarketer-1, BRANDON BECKER, the defendant, together with others known and unknown, concealed that Telemarketer-1 was the true underlying merchant. BECKER and his co-conspirators created approximately 26 sham companies, each headed by a "signer." Based on my and other law enforcement agents' interviews with these signers, I know that these individuals typically had no knowledge of Telemarketer-1, its business, or sometimes even how that individual's identity was being used. BECKER and his co-conspirators then prepared fraudulent merchant applications for each of the sham companies. Those merchant applications falsely described the "business" of each sham company.

12. Thereafter, BRANDON BECKER, together with others known and unknown, caused Sales Agent-1 to submit the fraudulent merchant applications for the approximately 26 sham companies (the "Shell Accounts") to a wholesale ISO based in New York City (the "New York ISO"). As part of the fraud scheme, BECKER and his co-conspirators knew that, subject to the underwriting approval of the New York ISO, the New York ISO would in turn obtain payment card processing for each of the approximately 26 sham companies, by "onboarding" them with Payment Processor-1, which would arrange for processing through its associated bank, Bank-1.

13. By steering Telemarketer-1's payment processing through these sham companies, BRANDON BECKER, the defendant, and his co-conspirators accomplished a number of fraudulent purposes.

    a. First, the use of these sham companies made it possible for Telemarketer-1 and other high-risk merchants to conceal their identities from Payment Processor-1 and Bank-1. This was particularly relevant as Payment Processor-1 repeatedly required Sales Agent-1 to close the accounts of the sham merchants because of excessive chargebacks and prohibited services. BECKER then caused Sales Agent-1 to quickly replace the closed merchants with new sham merchants, precluding Payment Processor-1 from shutting down its processing of Telemarketer-1 and other high-risk merchants.

b.   Second, the fraudulent processing scheme enabled Telemarketer-1 and other high-risk merchants to spread out their charges and their chargebacks across multiple sham accounts. This enabled them to evade chargeback monitoring programs operated by Bank-1, Payment Processor-1, and the New York ISO.

c.   For example, based on my interview of employees of the New York ISO and Payment Processor-1, including risk auditors, as well as my review of the Guidelines and Sales Agent-1 e-mails, I know that merchant accounts that accrued over 100 chargebacks per month and/or a ratio of more than 1% of chargebacks to transactions, were likely to be flagged and terminated. Based on my review of an internal Sales Agent-1 tracking spreadsheet, I know that Telemarketer-1's Shell Accounts averaged over 10% chargebacks every month after July 2013, and ranged as high as approximately 61% chargebacks in August 2014, two months before the last of the shells was terminated by Payment Processor-1. Collectively, the Telemarketer-1 Shell Accounts exceeded 100 chargebacks per month from July 2013 through October 2014, ranging between approximately 120 to 397 monthly chargebacks. Thus, BECKER's and Sales Agent-1's splitting of Telemarketer-1's transactions among those Shell Accounts meant that each individual Shell Account did not top more than 100 chargebacks per month, delaying its ultimate termination.

### Specific Communications

14.   I have reviewed e-mail correspondence sent or received by BRANDON BECKER, the defendant. Based on my review of those emails, I have learned the following:

a.   On or about April 25, 2013, a Sales Agent-1 executive ("Employee-1") sent BECKER and an agent involved in the Telemarketer-1 deal an e-mail forwarding a press release and complaint from the FTC about a civil action the FTC had brought against a telemarketing scam similar to the Telemarketer-1 scheme, with the heading "FTC Brings Seventh Action in Three Months Against Debt Relief Companies Tampa Telemarketers Alleged to Have Falsely Promised To Save Consumers Thousands on Credit Card Debt." In that email, Employee-1 wrote, in part, "From what I see there is great exposure and we should be shutting this animal down as quickly as we can do so without it crashing. If they do not have a defense for the type of charges contained in the link here, than there is no defense that will work and our merchants are fully exposed."

b.   Notwithstanding Employee-1's email, BECKER elected to continue the scheme for another 18 months, and to submit

6

additional applications for sham merchants to the New York ISO, Payment Processor-1, and ultimately Bank-1 for payment processing.

    c. On or about May 23, 2014, BECKER wrote to Employee-1, in part "I'm seeing the [Telemarketer-1] refunds and [chargebacks] at high numbers – we really need to start building the reserve from his side if were [sic] to wind out of this. Especially with the hope of keeping the funds we already earned, which we must for all the risk."

    d. In a response e-mail, Employee-1 characterized the numbers as "pretty awful," and attached a spreadsheet ("Spreadsheet-1"), which disclosed the chargebacks on 24 Shell Accounts used for the Telemarketer-1 scheme.

      i. Spreadsheet-1, entitled "CB [chargeback] Activity 4 months to 5-23-14," includes a column titled "Merchant," which contains the names of the 24 Shell Accounts that had been opened to date, along with the dates they were opened and the dates that 12 of the accounts had been closed.

      ii. Another column, labeled "Sub Agent," contains the name of Telemarketer-1 and its principal name next to each of the 24 Shell Accounts.

      iii. Spreadsheet-1 also contains a column labeled "CB # %," which based on my participation in this investigation, I understand to mean the percentage of chargebacks from all sale transactions. Based on my interviews of individuals involved in underwriting and audits at ISO-1 and Payment Processor-1, I know that a ratio over 1% is a red flag that the merchant is likely engaged in misrepresentations to customers or fraudulent activity. Spreadsheet-1 disclosed chargeback percentages ranging from about 4% to about 29% for each of the open Shell Accounts for the month of April 2014, among other months.

 15. Based on my review of emails and documents, and witness interviews, I have learned that in or about May 2014, BRANDON BECKER, the defendant, instructed Sales Agent-1 employees to continue processing for Telemarketer-1, including by submitting additional false merchant applications to replace accounts that were being shut down, so as to preserve the profits made from the fraudulent processing scheme and to cover the cost of mounting chargebacks and refunds.

 16. Based on my review of emails and documents, and witness interviews, I have learned that in or about June 2014, BRANDON BECKER, the defendant caused two new Shell Account applications to be submitted to the New York ISO, for processing by Processor-1

7

and Bank-1 (the "June 2014 Merchants"). Like the prior sham merchant applications, these applications contained material misrepresentations about (1) the real identity of the merchant (i.e., by concealing that the real underlying merchant was Telemarketer-1, which had already processed transactions through 24 other Shell Accounts), (2) the nature of the business the merchant was engaged in (i.e., that the business was providing innocuous "budgeting" services rather than promising to reduce customers' debt or interest rates), and (3) the physical site of the merchant's business and its employees, among other things.

17. Based on my review of data received from a payment gateway provider company that processed transactions for the Telemarketer-1 Shell Accounts ("Payment Gateway Provider-1"), I know that the June 2014 Merchants processed over $1.6 million in transactions from the time their accounts were opened in June 2014 through on or about October 20, 2014, when Payment Processor-1 closed the last Telemarketer-1 Shell Account.

18. Based on my review of the Declaration, data from Payment Gateway Provider-1, and financial records prepared by employees of Sales Agent-1, I have learned that, from in or about September 2012 through on or about October 20, 2014, the Shell Accounts charged in excess of $19 million to victims of the Telemarketer-1 scheme, of which in excess of $6 million was returned to the victims by way of refunds or chargebacks.

19. Based on my review of emails, I know that during the relevant period, BRANDON BECKER, the defendant, regularly caused employees of Sales Agent-1 in Los Angeles to send and receive wire communications, such as e-mails and telephone calls, from the New York ISO's employees in New York relating to onboarding and maintaining credit card processing for the Telemarketer-1 Shell Accounts.

## Flight to Germany

20. Based upon my participation in this investigation, witness interviews, and upon information and belief, I believe that in recent weeks BRANDON BECKER has become aware of the increasing intensity of the investigation in this case and of his status as a putative target.

21. Based upon witness interviews, conversations with other law enforcement agents and records of the Customs and Border Protection Service, I have learned that yesterday, September 22, 2019, BRANDON BECKER, the defendant, purchased a one-way ticket to Berlin, Germany, via Zurich, Switzerland. That one-way ticket was for travel on the day of purchase. At or about 7:00 p.m. PDT on

September 22, BECKER boarded that flight, whereupon he was arrested.

WHEREFORE, I respectfully request that an arrest warrant be issued for BRANDON BECKER, the defendant, and that he be imprisoned or bailed, as the case may be.

_____
MELODY SHEN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
23rd day of September, 2019

_____
ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York